## Richmond

## Norfolk and Western Railway Company v. Walter H. Anderson, Et Al.

November 28, 1966.

Record No. 6252.

Present, Spratley, Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*William Rosenberger, Jr.*, for the plaintiff in error.

*James M. Roe, Jr.* and *Dudley J. Emick, Jr.* (*Carter and Roe*, on brief), for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Walter H. Anderson and Walter H. Anderson, Jr., plaintiffs, brought this action against Norfolk and Western Railway Company, defendant, to recover damages for injury to their 1962 crop of tomatoes and other vegetables which they alleged was caused by the negligence of the defendant in spraying its right of way. A jury returned a verdict for the plaintiffs in the sum of $9,000, on which the court entered judgment, and we granted a writ of error.

The defendant contends that the verdict was contrary to the law and the evidence and without evidence to support it; that opinion evidence was improperly admitted; that photographs of tomato plants taken at a test plot were erroneously excluded; that the question of damages was not properly presented to the jury, and that a *res ipsa loquitur* instruction was improperly given.

The plaintiffs owned a farm in Rockbridge county along the west side of defendant's right of way. In the season of 1962 they had 6270 tomato plants and some other vegetables growing in a field of about 3.25 acres adjacent to and extending along the west side

of the right of way for a distance of 525 feet. From the center of the railroad track to the fence along the east side of the tomato patch was a distance of 33 feet.

On July 19, 1962, defendant's spray train passed the plaintiffs' farm spraying the railroad right of way with Veon brush killer to kill the brush and broadleaf weeds within the right of way.

Plaintiff Anderson testified that he observed the spray train as it proceeded north; that there was "a pretty good breeze blowing from the southwest to the northeast" and that the train "sprayed all along the railroad tracks and the mist and spray drifted right across the tomato patch and also our corn field."

Mrs. Anderson testified that she saw the train as it passed and "they" were spraying all along the railroad and she could see that "it was all fog and misty all over, and it was high * * [a]ll over the field and on the railroad too."

Plaintiff Anderson, Jr., testified that he arrived home soon after the train had passed and he and his father then examined the tomato field and "you could tell the spray had gotten on the tomato plants, moist leaves, and as I walked on farther down through the field naturally it would get lighter but you still could see it was on the tomato plants."

The father testified that "the mist had settled on there and you could tell it by feeling the leaves and it was moist and sticky and a very strong odor."

The plaintiffs testified that within three or four days after the spraying the leaves on the tomato plants wilted, the blossoms turned black and dropped off, and the large weeds left in the field to protect the plants from the sun had wilted. They said that the plants near the railroad track were completely killed but those farther away were not completely killed and those sheltered by the corn were not injured.

Plaintiffs also testified or introduced evidence to the effect that 1962 was an unusually fine growing season and the tomato plants and the fruit were strong and healthy and showed no signs of disease prior to the spraying done by the defendant.

Employees of the defendant who were on the spray train testified that the amount of spray used and the spray pressure were reduced while the train was passing by the tomato field and the spray reached only about 15 feet from the track, leaving a buffer of about 18 feet between the sprayed area and the plaintiffs' property. They also

testified that according to their records there was no wind on the day of the spraying. Defendant also introduced evidence, including photographs, to show that between the edge of the sprayed area and the plaintiffs' tomato field the vegetation remained green after the spraying.

Other witnesses for the defendant testified that if the spray used by the defendant had got on the tomato plants it would have killed them and stopped their growth completely; and that an examination of the tomato field made on September 20, 1962, disclosed signs of disease typical of early blight, and laboratory tests of some of the plants by microscope confirmed this diagnosis. There was also evidence that the spray used by the defendant was not volatile and there would be no resultant vapor or mist from its use. However, it was shown that directions for its use sent out by the manufacturer contained the caution: "Do not permit spray mist containing it to drift onto them [vegetables, flowers, etc.], since even minute quantities of the spray may cause injury."

In substance plaintiffs' claim was that the spray was discharged from defendant's train at such time and in such manner as to allow it to reach their tomato plants and cause the vines to wither and the leaves to fall, exposing the fruit to the hot sun, which scalded it and rendered it unmarketable and unusable.

Defendant defended on the ground that the spray could not have gotten on the tomato plants and did not, else they would have been killed completely, and that the damage to the tomato crop was caused by blight, not by the spray.

The resulting conflict in the testimony made an issue for the jury to decide, and defendant's motion to strike plaintiffs' evidence was properly overruled.

■ Defendant further contends, however, that errors to its prejudice were committed in the trial. First, it says that plaintiffs' witnesses Cook and Dunlap were not expert and should not have been allowed to express opinions on questions at issue.

Cook had spent about fifty-five years in raising and canning tomatoes and working in canneries, and was familiar with the effect of blight on tomatoes. He had handled tomatoes from the Andersons for some years and in the season of 1962 was using their tomatoes for canning purposes, paying them $1 a bushel until those they brought in were so sunburned he could not use them. He was asked whether

he saw any evidence of anything else on the tomatoes and he replied: "That is all I seen was sunburn."

Dunlap held a B.S. degree in agriculture from V.P.I. and for twenty-five years had been county supervisor for the Farmers Home Administration, U.S. Department of Agriculture, and his work involved giving technical advice to farmers, including the Andersons, in regard to the growing of crops and the control of diseases. He visited the Andersons' property on May 18, 1962, two months before the spraying, and he saw that they had a nice crop of tomatoes which were doing well. He was back again on July 28, nine days after the spraying, and found the vines wilting and yellowing and he "couldn't see any signs of blight or disease." He described the evidences of blight and in response to a question on cross-examination he expressed the opinion that it was vapor mist from the spray that caused the trouble.

The knowledge necessary to qualify one to speak as an expert may be derived from study or experience, or both. The witness need not have all the knowledge possible for one in his class to entitle him to speak, but he may testify as an expert if it is shown that he has sufficient knowledge of his subject to give value to his opinion. 7 Mich. Jur., Evidence, § 167, p. 530; 20 Am. Jur., Evidence, § 814, p. 684; *Swersky v. Higgins*, 194 Va. 983, 76 S.E.2d 200; *Ames & Webb, Inc. v. Commercial Laundry Co.*, 204 Va. 616, 133 S.E.2d 547; *Rollins v. Commonwealth*, 207 Va. 575, 151 S.E.2d 622, decided today.

The trial court properly instructed the jury as to the elements to be considered in weighing the testimony of expert witnesses, and no error was committed in receiving the testimony of these witnesses.

Defendant complains of the court's refusal to admit in evidence four photographs taken of a test plot at V.P.I. by defendant's expert witness Dr. Chappell, professor of plant pathology and physiology at that institution. They were offered by him as showing early blight on tomato plants and to compare them with the photographs of the Anderson plants previously introduced. These photographs had some relevance to the main issue of what caused the damage and should have been admitted. *Venable v. Stockner*, 200 Va. 900, 108 S.E.2d 380; *Wright v. Kelly, Adm'r*, 203 Va. 135, 122 S.E.2d 670.

Defendant argues that the issue of damages was not properly submitted to the jury. The jury's verdict stated that they found for the plaintiffs according to Instruction 1-A. That instruction told the

jury that if they found that the defendant negligently permitted its spray to "precipitate" on the land of the plaintiffs and thereby damaged the property of the plaintiffs, "then they should find a verdict in favor of the plaintiffs in such amount as will compensate the plaintiffs for such damage as they may find from the evidence they have suffered."

Defendant objected to this instruction on the ground, among others, that it did not state a proper standard for determining the amount of damages. The objection was well taken. This was the only instruction given the jury on the subject of the amount of damages. It provided no measure or guide for the jury to apply or follow, and it would be pure speculation as to what standard they used.

Plaintiffs' evidence was that there were 6270 tomato plants and Anderson, Jr., testified they would have yielded one bushel of tomatoes per plant, or 6270 bushels, which could have been sold for $4 per bushel; that the expense of raising and marketing would have been $1 per bushel, leaving a profit of $3 per bushel, or $18,810. He further testified that by July sales of tomatoes had amounted to $1,484.25; that the sales of tomatoes and vegetables in August, as indicated by bank deposits, amounted to $922.20, and there had been sales of smaller amounts later on. He did not have a record of the number of bushels sold.

On the other hand, there was evidence that Anderson, Sr., had stated that before the damage occurred they had sold 184 bushels of tomatoes for $725; that the original claim for damage was based on one-half bushel per vine; that the average production of tomatoes in Virginia over the last three years was a little over six tons per acre, whereas one bushel for each of the 6270 vines on the 3.25 acres would amount to 47 tons per acre.

*City of Portsmouth* v. *Weiss*, 145 Va. 94, 133 S.E. 781, was an action for damages against the city for flooding plaintiff's land and destroying a crop of bulbs growing thereon. The opinion states that the bulbs were raised for market and after maturing they would be dug up, dried and sold. It was there said:

"According to the great weight of authority the true measure of damages for a loss or partial destruction of a growing crop is the value of the crop in the condition it was at the time and place of destruction. But the difficulty is to ascertain that value. In the instant case the trial court directed the jury to consider what

would be the probable yield of the crop and the value of that yield at maturity, and to take from it the expense of maturing, harvesting and marketing. This, we take it, was a fair way of estimating the value of the crop at the time of its destruction. * *" 145 Va. at 114, 133 S.E. at 787.

In the case in hand, however, there was not a total destruction of the crop, but the evidence was that some production continued and sales were made which should be taken into account.

Here the jury should have been instructed that any damages allowed should be based on evidence as to the probable yield of the crop, the value of that yield in the market when the tomatoes and other vegetables would have been sold, and to deduct therefrom (1) the amount that was received or should have been received from those sold or which should have been sold, and (2) the reasonable cost of the labor and expense that would have been required to mature, care for and market the crop.

▇ Over the objection of the defendant the court gave to the jury the following *res ipsa loquitur* instruction:

> "The Court instructs the jury that if the instrumentality which caused the plaintiffs, Andersons, damage was in the control of the defendant, Norfolk and Western Railway Company, and the damage was such as would not ordinarily occur if reasonable care was used by the defendant, and the defendant alone had the means of discovering how and why it happened, the jury may infer that the damage was due to some negligence of the defendant."

This instruction was erroneous and should not have been given. The instrumentality which caused the damage, according to the plaintiffs, was the spray train. There was no question that it was in the control of the defendant. The instruction therefore told the jury that (1) if the damage would ordinarily not have occurred if the defendant had used reasonable care, and (2) if the defendant alone had the means of discovering how and why it happened, then (3) the jury could infer that the damage was due to some negligence of the defendant.

In the first place, the damage could have occurred regardless of the care used by the defendant if the damage was in fact caused by blight, as the defendant contended; and, in the next place, the

evidence did not support the premise that the defendant alone had the means of discovering how and why the damage occurred. The plaintiffs claimed that they knew better than the defendant how and why it occurred. The fundamental issue in the case was whether the damage was caused by the spray, as the plaintiffs asserted, or by blight, as the defendant claimed. On this issue the burden was on the plaintiffs to show that it was caused by the spray. The plaintiffs were not entitled to have the benefit of any inference of negligence on the part of the defendant on this issue. The negligence of the defendant, if any, was in permitting its spray to get on the plaintiffs' plants, and the burden was on the plaintiffs to prove that it did.

The doctrine of *res ipsa loquitur* does not apply where there is evidence explaining the cause of the damage or where it may have been attributable to one of two causes, for only one of which the defendant is responsible. *Arnold* v. *Wood*, 173 Va. 18, 25, 3 S.E.2d 374, 376.

In *Danville Community Hospital* v. *Thompson*, 186 Va. 746, 757, 43 S.E.2d 882, 887, it was said:

> "* * Generally speaking, that doctrine applies in negligence cases where the instrumentality which caused an injury is within the exclusive possession and control of the person charged with negligence, and such person has, or should have, exclusive knowledge of the way that instrumentality was used, and the injury would not ordinarily have occurred if it had been properly used. * *"

Here what "instrumentality" caused the injury is itself the primary question at issue and the doctrine of *res ipsa loquitur* does not apply to that issue. See *Beer Distributors, Inc.* v. *Winfree*, 190 Va. 521, 524-5, 57 S.E.2d 902, 903-4; 65A C.J.S., Negligence, § 220.12, p. 558.

We cannot agree with the plaintiffs' argument that the giving of this instruction, if error, was harmless. It gave the plaintiffs the benefit of an inference when proof was required.

The judgment appealed from is accordingly reversed, the verdict of the jury is set aside, and the case is remanded for a new trial.

*Reversed and remanded.*